UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

BRIAN STEWART,
   Plaintiff,

vs.                                                          No. 05-1210

ROGER WALKER, et.al.,
   Defendants,

## SUMMARY JUDGEMENT ORDER

This cause is before the court for consideration of the summary judgement motions filed by the defendants [d/e 217, 235, 242, 259] and the various responses filed by the plaintiff.

### I. BACKGROUND

The plaintiff has the following surviving claims against 15 defendants from the Illinois Department of Corrections and Pontiac Correctional Center:

1) Defendants Kowalowski, Mote, Melvin, Garlick, Larson, Angus, Smith, Walker, Orr, Young, Zehar, Selvidge, Fletcher and Jesse Montgomery violated the plaintiff's Eighth Amendment rights when they were deliberately indifferent to his serious medical condition.  Specifically, the plaintiff claims the defendants knew he needed mental health treatment, but refused to transfer him or provide him with appropriate care.  As a result, the plaintiff says he repeatedly injured himself.   The claim is against the defendants in their official and individual capacities.  The plaintiff claims there is a custom of failing to properly train and supervise officers who were responsible for monitoring inmates with similar problems.

2) Defendant Richard Montgomery violated the plaintiff's Eighth Amendment rights when he was deliberately indifferent to the plaintiff's serious medical condition.  The claim is against the defendant in his individual capacity.

3) Defendant Richard Montgomery violated the plaintiff's Eighth Amendment rights when he used cruel and unusual punishment against the plaintiff by repeatedly throwing feces on the plaintiff. The claim is against the defendant in his individual capacity.

The court notes that these are the **only** claims before the court.  The plaintiff continues to argue claims that he has never successfully articulated such as claims of conspiracy.   The plaintiff's original complaint was filed on July 25, 2005 pursuant to 42 U.S.C. §1983 against twenty-two defendants from four different correctional facilities.  The lengthy handwritten complaint with hundreds of pages of attached documents did not clearly delineate specific claims against any of the named defendants.  The court dismissed the complaint as a violation of Rule 8

of the Federal Rules of Civil Procedure. The court then spent the next two years trying to help the plaintiff clearly identify his claims. *See* October 11, 2005 Order; October 19, 2005 Order; May 2, 2006 Order; June 21, 2006; August 14, 2006 Order; June 20, 2007. However, the plaintiff responded to each order with a additional motions to amend his complaint and a variety of other motions. On July 11, 2007, the court closed the pleadings in this case and clearly stated that the case would proceed only on three claims identified above.

## II. FACTS

The following facts are taken mainly from medical records, affidavits and the plaintiff's deposition. The court notes that the plaintiff responded to the majority of the defendants' list of undisputed facts by claiming they were "unintelligible" to the plaintiff's claims. *See* Plan. Resp. # 246, p. 17-60; Plain Resp. #256, p. 11- 61.

Defendant Dr. Alton Angus was a psychologist at Pontiac Correctional Center during the relevant time periods. Defendant Dr. Edward Smith was a clinical psychologist and Defendant Dr. John Garlick was the Psychologist Services Administrator. Defendant Dr. Dennis Larson was a doctor at Pontiac Correctional Center from 2001 through 2006, and during his final year was the Medical Director. Dr. Kowalkowski and Dr. Fletcher and Dr. Mark Fisher are psychiatrists.

Defendant Richard Montgomery has been employed as a correctional officer at Pontiac Correctional Center since March 19, 1990. Defendant Montgomery has never been terminated from his job with the Department of Corrections. In addition, Montgomery says he was never assigned to the North Segregation Unit or the Mental Health Unit and does not know the plaintiff. (Def. Memo, Ex. C, Mont. Aff, p. 1)

Defendant Walker was the Director of the Illinois Department of Corrections during the relevant time period of the plaintiff's complaint. The defendants state that Walker did not receive, review, or respond to any grievances from the plaintiff. The initials on the grievances indicate they were signed by Administrative Designee Terri Anderson. (Def. Memo, Fairchild Aff.) In addition, the plaintiff did not appeal any grievances concerning the actions of Defendant Selvidge that he alleges occurred in February 2005, March 2007 or December 29, 2005. The plaintiff also did not appeal any grievances concerning the conduct of Defendant Young in February of 2005. (Def. Memo, Fairchild Aff.)

The plaintiff in his deposition says his claims against Dr. Larson stem from four events. First, the plaintiff says he would injure himself, but he would not receive care. The plaintiff says he wrote six letters to Dr. Larson asking for treatment, but received no response. Second, the plaintiff says Dr. Larson observed two officers throwing ice water on him while he was on suicide watch, but did nothing to intervene. Third, the plaintiff says some of his cuts became infected and he sent a request for care to Dr. Larson, but got no response. Finally, the plaintiff says he requested tests to see how the drug Haldol had impacted his liver and other organs, but Dr. Larson did not approve his request. (Plain. Depo, p. 34 -36) In his response to the summary judgement motion, the plaintiff adds that Dr. Larson failed to properly train and supervise staff

to deal with inmates struggling with mental health issues.

The plaintiff first arrived at Pontiac Correctional Center on April 23, 2004. The plaintiff was transferred from Dixon Correctional Center. His outpatient medical records from Dixon describe the plaintiff as "[p]layer- manipulator, drug abuser while in the DD program." (Med. Rec, p. 751).

Three days after he arrived at Pontiac, the plaintiff was evaluated by Psychiatrist Dr. Kowalkowski. The doctor noted that the plaintiff had no active or passive suicidal or homicidal thoughts. (Def. Memo, Larson Aff., p. 1, Med Rec. P. 761). The next day the plaintiff was seen by a clinical psychologist who reported that the plaintiff had an interest in group therapy and had no suicidal or homicidal plans. (Def. Memo, Larson Aff., p. 1-2, Med Rec. P. 763). The plaintiff claims both of these evaluations were done through a steel door without any chance for the doctors to observe the plaintiff or his self-injuring behavior.

Dr. Kowalkowski met with the plaintiff face-to-face on May 3, 2004. The plaintiff says Dr. Kowalkowski would see him about once a month. During these visits, the they would discuss how the plaintiff was doing in general and if his medications were beneficial. (Plain. Depo, p. 60).

Dr. Kowalkowski recommended that the plaintiff be placed in a Mental Health Unit afer his first office visit with the plaintiff on May 3, 2004 because group therapy sessions were available there. The doctor's report indicates he "discussed in detail with the patient a mental health treatment plan." (Def. Memo, Ex. B., May 3, 2004 report, p. 2-3) The doctor changed the plaintiff's medication from Haldol to Risperdal and explained in detail the possible side effects. The doctor stated that he believed the plaintiff should be transferred to the Mental Health Unit on voluntary, non-emergency basis. The doctor noted that he believed the patient understood the treatment plan that was outlined. However, the plaintiff refused to sign the waiver to be transferred. The doctor explained to the plaintiff that he would not be transferred unless he signed the waiver, but the plaintiff still refused. (Def. Memo, Ex. B., May 3, 2004 report, p. 3) The medical records note the plaintiff stated that his attorney "said not to sign anything that would go against my lawsuit." (Def. Memo, Ex. B., May 3, 2004 report, p. 3).

Dr. Kowalkowski states that while he can recommend that patient be housed in the mental health unit, he cannot order the placement because "the recommendation must await approval based on other factors, such as bed space." (Def. Memo, Ex. C., Kowalkowski Int. Resp. #9). The defendants further state that all recommendations concerning inmate placement in a mental health setting are reviewed in accordance with Illinois Administrative Code. *See* Ill.Admin. Code, Title 20, Sections 415 and 503. Psychiatric transfers are reviewed by the following individuals or their designees: the Clinical Supervisor, the Assistant Warden of Programs, Assistant Warden of Operations, the Warden, the Deputy Director and the Transfer Coordination office. (Def. Memo, Ex. A Garlick Aff. p. 8) The defendants maintain these procedures were followed with the plaintiff's transfer.

On May 6, 2004, mental health staff including Defendant Angus conducted a crisis

evaluation, after staff reported that the plaintiff had written a letter stating he was going to cut himself if he was not put into mental-health group therapy. (Def. Memo, Larson Aff., p. 2, Med Rec. P. 764) . The staff noted that the plaintiff was calm and cooperate with no psychotic symptoms. The plaintiff denied suicidal thoughts and was determined to be a moderate suicide risk. Nonetheless, the plaintiff was determined to have psychotic disorder based on his history and possibly a personality disorder as well. The plaintiff was placed in a crisis cell for observation every ten minutes. In addition, for safety concerns, the plaintiff kept the plaintiff's clothes and he was placed in a strip cell. The defendants say this was the protocol for suicidal watch cells. A psychiatrist was also informed of the plaintiff's watch status. He told the staff to again request that the plaintiff sign a mental health transfer form. The plaintiff refused. The psychiatrist was informed and the plaintiff's watch status continued. (Def. Memo, Larson Aff., p. 2-3, Med Rec. p. 764, 765).

On May 7, 2004, the plaintiff was again evaluated by Defendant Angus. The plaintiff had no other incidents of self-injurious behavior, but had broken off a sprinkler head in his cell. The plaintiff appeared to be calm and cooperative and showed no signs of psychosis. The plaintiff was determined to be a minimal suicide risk. Therefore, he was given back some of his property and watch intervals were lengthened to every 15 minutes. (Def. Memo, Larson Aff., p. 3, Med Rec. p 766).

The plaintiff was seen by either Dr. Larson or medical-health staff the next three days. Each time he denied any suicidal thoughts. Watch times were increased to every 30 minutes. The plaintiff assured staff that he would not harm himself and his mental health status was determined to be within normal limits. The plaintiff was given a copy of the mental-health transfer form that he had refused to sign and he was advised to see mental-health staff as needed. The plaintiff was discharged from watch. (Def. Memo, Larson Aff., p. 3-4, Med Rec. p. 767, 768).

Clinical Psychologist Edward Smith saw the plaintiff on May 26, 2004. The doctor observed that the plaintiff appeared to be doing well and he denied any suicidal ideation. (Def. Memo, Larson Aff., p. 4, Med Rec p. 873)

On June 4, 2004, the plaintiff saw Dr. Kowalkowski again. The plaintiff stated that he was not having a good response to Risperdol and believed he did better with Haldol. (Def. Memo, Ex. B, June 4, 2004 report, p. 1). The doctor agreed to discontinue Risperdol and put the plaintiff back on Haldol.

On June 10, 2008, Defendant Angus performed another crisis evaluation of the plaintiff. The plaintiff was asked about a letter that was received in the mental health office that appeared to be signed by the plaintiff. The letter had statements concerning a lack of will to live and feeling hopeless. The plaintiff denied writing the letter. However, staff compared the handwriting to other samples from the plaintiff and determined that he had written the letter. The plaintiff was placed in a crisis cell with limited property and a 15 minute watch. (Def. Memo, Larson Aff., p. 4-5, Med Rec. p. 770).

The plaintiff was re-evaluated the next day.  The plaintiff appeared to be doing well and denied any suicidal thoughts.  The plaintiff assured Defendant Angus that he would not harm himself.  The plaintiff stated that he was doing better and asked to be taken off watch status.  The plaintiff was discharged with instructions to continue taking his mediation and see the psychiatrist as scheduled.

Dr. Kowalkowski met with the plaintiff on July 12, 2004 and wrote a mental health evaluation.  The doctor noted the plaintiff seemed somewhat paranoid and suspicious, but he appeared to be doing well with his medications and denied any plans to harm himself. (Def. Memo, Ex. B, July 12, 2004 Rep.)

On July 21, 2004 the plaintiff requested to speak with mental health staff.  The plaintiff stated that he had talked to his attorney and would sign the recommendation for his transfer to the mental health unit. (Def. Memo, Larson Aff., p. 6, Med Rec. p. 773).

On July 23, 2004, the plaintiff was seen by medical staff after he injured himself.  The plaintiff reported that he had cut himself on the left forearm with a staple.  The injury required stitches.  Dr. Larson saw the plaintiff in his cell the next day.  Although the plaintiff denied suicidal thoughts, the doctor believed the plaintiff was engaging in self-injurious behavior and should be checked every 15 minutes. (Def. Memo, Larson Aff., p. 6-7, Med Rec. p. 774, 775).

On July 25, 2004, Dr. Larson again saw the plaintiff in his cell.  The plaintiff said he did not want to talk to the doctor.  The doctor says his "plan was to continue 15 minute close supervision checks." (Def. Memo, Larson Aff. p. 7).

The next day, mental-health staff again attempted to see the plaintiff.

> Mr. Stewart sated "this is bullshit."  He was hostile and irritable and refused the interview.  Thus, mental-health staff were unable to access him further. The plan, therefore, was to continue the 15 minute checks. (Def. Memo, Larson Aff., p. 7, Med Rec. p. 776).

Nursing staff treated the plaintiff on July 26, 2004, after the plaintiff had removed the sutures from his laceration and said he was going to continue to cut himself.  A doctor was called and the plaintiff told him that he wanted to kill himself.  The plaintiff said he did not like the North Cell House and that the psychologists were playing games with him.  The doctor treated the plaintiff's wound and ordered his medications to be continued.  Shortly after five in the late afternoon, the doctor also ordered that the plaintiff be placed in four-point leather restraints to protect him from harming himself.  Even after he was in the restraints, nurses observed the plaintiff trying to bite his own arm.  The plaintiff was kept in the infirmary in restraints and monitored for the remainder of the day and the following morning.  The defendants say the plaintiff was periodically allowed to have one arm released and was offered the use of a urinal. (Def. Memo, Larson Aff., p. 7-8, Med Rec. p. 776- 782).

On the morning of July 27, 2004, the plaintiff was again evaluated by a doctor and a

psychologist who determined that the plaintiff was doing better. He was removed from restraints and placed in a strip cell with 10 minute watch intervals.

Dr. Kowalkowski met with the plaintiff later in the day. The plaintiff said he was having a difficult time adjusting to his new placement in the north segregation unit. The plaintiff also informed the doctor that he had now signed the recommendation for transfer to the Mental Health Unit. Dr. Kowalkowski said he would continue his recommendation. The doctor noted the plaintiff had been fairly stable on his medications and would continue the prescription.

Over the next two days, the plaintiff was seen by a doctor, a clinical psychologist and mental health staff. The plaintiff continued to complain that he could no stand the noise in the North Cell House and asked to be transferred. The plaintiff was "irritable, demanding" and believed mental health staff could order his transfer. The staff believed the plaintiff "continued to present a risk of harm if he did not get what he wanted." (Def. Memo, Larson Aff. p. 9, Med Rec. p. 792-793. The plaintiff was kept in a watch cell, but checks were extended to every 30 minutes.

The plaintiff was seen by a clinical psychologist on July 30, 2004:

> Mr. Stewart complained about not being transferred to the mental-health unit and stated, "I'll keep cutting, I'll show you." Mr. Stewart was observed to be alert and oriented, but was demanding to be moved to a different gallery and threatened to cut himself further. His diagnosis was unchanged and he remained on 30 minute watch checks. (Def. Memo, Larson Aff., p. 10, Med Rec. p. 797).

A doctor met with the plaintiff later in the day and he was discharged from the infirmary to a regular watch cell with 30 minute checks.

The plaintiff returned to the infirmary on the evening of July 31, 2004, after injuring himself with a chicken bone. The plaintiff said he was depressed and suicidal. The plaintiff was put on ten minute check schedule and placed in restraints. The plaintiff was gain kept in the infirmary in four point restraints for the remainder of the evening into the next day. (Def. Memo, Larson Aff., p. 10, Med Rec. p. 799-805).

The plaintiff was evaluated by two separate doctors and mental-health staff the next morning. The first doctor ordered the restraints be removed, but the ten minute checks were to be continued and the plaintiff was to be evaluated by mental-health staff. The plaintiff spoke with the second doctor about his condition.

> Mr. Stewart told this medical doctor that he was doing fine and denied having self harm/suicidal ideation. He stated that he bit himself because he was placed in the North Cell House instead of either the South (mental) Cell House or Dixon Correctional Center. (Def. Memo, Larson Aff., p. 11, Med. Rec. p. 807)

6

The doctor warned the plaintiff of the possible dangers of his behavior and ordered the ten minute watch to continue.

Mental-health staff also evaluated the plaintiff on this day and the plaintiff again complained about his placement in the North Cell House. The plaintiff was advised that the transfer would have gone more quickly if he had cooperated with the transfer from the beginning. The plaintiff appeared better and was allowed some property back. Monitoring was extended to every 15 minutes.

This pattern continued with the plaintiff, medical and mental-health staff. On August 3, 2004, the plaintiff was seen by a doctor and by mental health staff. The plaintiff was moved to the third gallery of North Cell House as he had requested until a bed opened up for the plaintiff in the Mental Health Unit.

On August 4, 2004, mental-health staff met with the plaintiff after a letter was again received with vague threats of self-harm. Later that day, the plaintiff returned to the medical unit after he cut himself with a staple he had hidden in his mouth. The plaintiff stated he was unhappy with the "fags" in his new location. (Def. Memo, Larson Aff., p. 12-13, Med Rec. p. 815-816.)

> Mr. Stewart reported an intent to continue acting out to cut himself unless he was moved to a location that had no "fags." Mr. Stewart was observed to be defiant but in no distress. Stewart threatened further self-injurious behavior with the possibility of accidental death. (Def. Memo, Larson Aff., 13, Med Rec. p. 816)

The plaintiff was again placed on ten minute watches and put in restraints. A nurse observed the plaintiff to be "happy as a lark" and noted that the plaintiff said he was "glad to get away from the gays." (Def. Memo, Larson Aff., 13, Med Rec. p. 821) The four point restraints were removed the next day and the watch times were gradually eliminated over the next few days.

The plaintiff was seen by doctors and mental health staff three times on August 5, 2004 and two times on August 6, 2005. The medical staff continued to prescribe medication, offer counseling and encourage the plaintiff to work with mental-health staff.

Dr. Kowalkowski met again with the plaintiff on August 10, 2004; September 7, 2004; October 5, 2004 and November 3, 2004. Each time, Dr. Kowalkowski and the plaintiff discussed how he was doing and reviewed his medications. The doctor also noted that he still believed the plaintiff would benefit from some of the treatment possibilities in the Mental Health Unit and noted that the plaintiff was waiting to be transferred. On August 10, 2004, the doctor noted:

> The patient is having a slightly difficult time adjusting to the current environment. At no point in time did the patient express any active or passive suicidal or homicidal thoughts or ideation. The patient does not express any feelings of

>helplessness, hopelessness, or worthlessness. He denied any symptoms of manic, panic or a significant neurovegetative process. At times, the patient does have urges and impulses to hurt himself. Recently, the patient did harm himself. Today the patient seems under better control with regard to impulsive outbursts. (Def. Memo, Ex. B, August 10, 2004 report, p. 1)

On August 11, 2004, the plaintiff met with a nurse who removed sutures from his arm and noted that the injury appeared to be healing well.

On September 7, 2004, Dr. Kowalkowski met with the plaintiff and noted the plaintiff was doing well on his medication.

>The patient states he is waiting and getting somewhat impatient about his impending transfer to Pontiac Mental Health Unit. This patient has been approved for such a transfer and recommended by this writer. The patient is simply waiting for bed space to open up at this time......I reconfirmed and reinforced to the patient that he would be transferred to the facility as soon as a space is available. (Def. Memo, September 7, 2004 report).

The doctor makes similar notations in the medical record for the next two visits. The doctor observes that the plaintiff appears to be doing better on November 3, 2004. The plaintiff was scheduled to see Dr. Kowalkowski on December 7, 204, but failed to show up for his appointment.

The plaintiff was transferred to the Mental Health Unit in December of 2004. Clinical Psychologist Dr. Smith met with the plaintiff on December 9, 2004 as part of his orientation. The plaintiff says that Dr. Smith told him he would not be receiving the group therapy he was promised. The plaintiff says even though sessions were offered on a weekly basis, he was only allowed to participate on three occasions.

Nonetheless, the medical records demonstrate that the plaintiff met with psychologists, psychiatrist and other medical staff no less than 86 times from December 22, 2004 to August 30, 2006. Medications were prescribed and reviewed, treatment plans implemented including group therapy, counseling was given and the plaintiff was repeatedly asked how he was coping. As for group therapy, Dr. Garlick states the plaintiff "received group therapy as indicated and as group therapy sessions became available" until he was transferred out of the Mental Health Unit (Def. Memo, Ex. A, Garlick Aff, p. 9)

The plaintiff cooperated with most sessions when he was first transferred to the Mental Health Unit. The defendants claim the plaintiff failed to appear for at least one doctor visit and one group therapy session, but the plaintiff denies this. The plaintiff was not seen in urgent care again until August 15, 2005. The plaintiff said he needed to see a crisis team member because he needed to meet legal deadlines and needed to know where his papers were located. (Def. Memo, Larson Aff., p. 22-23, Med Rec. p. 847).

The plaintiff says he did try to hurt himself prior to August 15, 2005. For instance, the plaintiff says he was pulling on previous injuries and started to bleed while in a group therapy session on February 24, 2005, but Dr. Smith simply sent him back to his cell. There is a medical record for this group therapy session. The doctor stated that the plaintiff was "cooperative and provided appropriate feedback to the other group members.' (Def. Memo, Med. Rec. p. 900) The doctor also marked off a standard check list for the session and noted that the plaintiff's behavior and mental status during the session were "unremarkable" and there was "no significant distress noted/reported." (Def. Memo, Med. Rec. p. 900). The doctor planned to continue group treatment with the plaintiff.`

In September of 2005, the plaintiff began telling a psychiatrist and psychologist that he wanted to transfer to another mental-health setting. (Def. Memo, Larson Aff., 22-24, Med Rec. p. 850, 919-920, 924).

The medical staff at Pontiac Correctional Center keeps track of the medications administered to inmates. The plaintiff received his medication once in the morning and once in the evening. The administering nurse initials the date and time the medications are administered. If a patient refuses to take his medication, the nurse also notes this on the record. The medication record for the plaintiff in November of 2005 shows that he refused his prescriptions for Cogentin and Hadol on 13 mornings and 8 evenings. (Def. Memo, Larson Aff., p. 24, Med Rec. P. 952).

Nurse Zehr made an entry on November 21, 2005, about the plaintiff's continued refusal to take his medications. Nurse Zehr worked the morning shift during this time period and therefore was only responsible for dispensing the plaintiff's morning medications   The plaintiff refused to give a reason for his refusal and the nurse encouraged him to talk to the psychiatrist about his concerns. The nurse also sent a note to Dr. Fletcher about the plaintiff's refusal. On November 22, 2005, Dr. Fletcher reviewed the medication records of the plaintiff and discontinued his prescriptions. (Def. Memo, Larson Aff., 24, Med Rec. p. 851)

On November 23, 2005, the plaintiff complained to Nurse Zehr that he did not understand why Dr. Fletcher had stopped his medications. The nurse explained the number of days the plaintiff had refused his medication and that she had informed the doctor of this. The nurse also told the plaintiff that he could not simply start and stop taking medications without talking first to the psychiatrist. (Def. Memo, Larson Aff., p. 25, Med Rec. P. 854).

Dr. Fletcher says there are side effects with medication and there can be serious and permanent side effects with Haldol. The doctor says during the time she discontinued the plaintiff's medications, it was her medical opinion that the plaintiff had no mental health need for them. (Def. Memo, Fletcher Aff, p. 1)

Later on November 23, 2005, the plaintiff stopped mental-health staff member Angus as he was walking through the Mental Health Unit. The plaintiff complained that his medication had been discontinued and then asked Angus if he knew what the plaintiff "was like without his psychiatric medications and then gestured as if he was cutting his wrist and neck." (Def. Memo,

Larson Aff., 25, Med Rec. p. 855-856). Angus then took the plaintiff to the Mental Health Office. The plaintiff continued to complain about his medications and Angus told him he would be on 15 minute checks. Angus says the plaintiff then lunged at him and had to be restrained by security officers. (Def. Memo, Larson Aff., 25, Med Rec. p. 855-856)

The plaintiff was seen by doctors, a psychologist and a psychiatrist a total of six times in the next five days. The watch periods were decreased and terminated on November 28, 2008. Also on this date, the plaintiff met with Dr. Fletcher. The doctor noted that the plaintiff has sent numerous letters threatening to sue because he was taken off his medication. The plaintiff denied telling the nurse that he did not want his medication and denied he had refused any medication. "Dr. Fletcher explained to Mr. Stewart that if he refuses his psychiatric medications they will be discontinued. Mr. Stewart then did admit that he does refuse his morning medications. " (Def. Memo, Larson Aff., 27, Med Rec. p. 862, 925-927) The doctor also noted the plaintiff stated, "I heard about you and I'm going to take you down with an injunction." (Def. Memo, Med. Rec. p. 925). The doctor noted "appears to be sport for him. Smiles inappropriately while angry and attempting to intimidate." (Def. Memo., Med. Rec. p. 925). Nonetheless, the doctor did agree to prescribe the two medications for the plaintiff again.

On November 30, 2005, the plaintiff asked for his morning medication time to be changed so he could sleep longer. He also stated he had not done the therapeutic exercises given to him by Dr. Fletcher because he was focused on other things. (Def. Memo, Larson Aff., p. 27, Med Rec. p. 928)

On December 19, 2005, doctors Fletcher, Angus and Garlick agreed that the plaintiff should be transferred out of the Mental Health Unit.

> It was agreed that, in light of Internal Affairs recent finding that Mr. Stewart extorted money from a mentally challenged offender, Mr. Stewart should be transferred out of Pontiac Mental Health Unit. I, along with Dr. Fletcher and Alton Angus, determined that Mr. Stewart did not suffer from impairments of sufficient severity as to relieve him of personal responsibility for his conduct or that required continued placement in a specialized mental health setting. Despite his transfer out of the Pontiac Mental Health Unit, Alton Angus and Dr. Fletcher would continue to see Mr. Stewart. (Def. Memo, Garlick Aff, p. 6)

The plaintiff began cutting himself again on December 29, 2005. From December 29, 2005 through January 6, 2006, the plaintiff repeatedly cut himself or attempted to cut himself and threatened to cut an artery in response to his cell placement. Doctors, psychiatrists and psychologists continued to meet with the plaintiff repeatedly during this time period. The plaintiff received medication, was placed on 10 minute watch periods and four point restraints were used repeatedly for up to 16 hours during this time frame. The plaintiff said he would not harm himself if he was moved to another cell assignment. However, if he was moved back to the North Cell House, the plaintiff said he would continue to cut himself. (Def. Memo, p.28-36, Med. Rec. p. 1046-1120).

The plaintiff was seen by doctors and psychologists in his cell on January 8 and January 9, 2006. The plaintiff appeared to be doing better. He again attempted to negotiate his cell placement. Defendant Angus told the plaintiff that security would have the final say on his cell placement. (Def. Memo, Ex. B. Angus Aff., p. 13)

There are no medical records indicating any injury or self-injury to the plaintiff from February 16 to February 21, 2006. (Def. Memo, Ex. A, Garlick Aff, p. 8). However, Defendant Angus met with the plaintiff on February 21, 2006 after the plaintiff wrote a grievance. His grievance stated that on February 19, 2006, he told a medical technician that he was suicidal and bleeding and needed a crisis team member. The plaintiff claimed he was ignored.

> When I asked Mr. Stewart about the grievance, he would not initially confirm what he wrote. Mr. Stewart informed me that he only told a correctional medical technician that he had a history of suicidal behavior. Mr. Stewart further claimed that a learning disorder made it difficult for him to remember what he had written two days ago. Mr. Stewart was cooperative, but evasive. (Def. Memo, Ex. B, Angus Aff, p. 14, Med. Rec. p. 1125-1126)

Angus determined that the plaintiff was a minimal suicide risk. Nonetheless, he placed the plaintiff on 15 minute checks. (Def. Memo, Ex. B, Angus Aff., p. 14).

Defendant Angus checked on the plaintiff again the next day. Angus forwarded the plaintiff's claims concerning a medical technician to Internal Affairs. The plaintiff assured Angus he was not suicidal and the cell checks were discontinued. (Def. Memo, Ex. B, Angus Aff., p. 14, Med. Rec. P. 14)

In May of 2006, Dr. Vade saw the plaintiff concerning complaints of weight loss. The plaintiff had gone from 158 pounds to 149 pounds in less than a month's time. The doctor ordered medical tests and encouraged the plaintiff to eat. The doctors also decided to check the plaintiff's weight at sick call each month. (Def. Memo, Larson Aff., 38, Med Rec. p. 1130-1131).

In other claims, the plaintiff states that on November 27, 2005, two officers threw ice water on him and Dr. Larson observed it. The plaintiff was housed in the South Mental Health Unit. In his deposition, the plaintiff says the cells have solid doors of steel and plexiglass. There is an opening about waist high that allows officers to handcuff inmates. The plaintiff claims officers were throwing ice water on him through this opening. The plaintiff says he saw Dr. Larson about four cells down coming through a gate into the unit. The plaintiff says he called for help from Dr. Larson, and the officers stopped their attack. The plaintiff says when Dr. Larson did approach his cell, all he did was laugh. (Def. Memo, Plain. Depo. p. 39- 42).

Dr. Larson admits stopping by the plaintiff's cell on November 26 and November 27, 2005. On November 27, 2005, the doctor states when he asked the plaintiff about his intent to harm himself, the plaintiff instead claimed that two officers were "messing with him and trying to beat him up." ( Def. Memo, Larson Aff, p. 26). The doctor does not note any observations

11

concerning an assault or water in the plaintiff's cell.

According to the Offender Tracking System, the plaintiff resided in the following locations in Pontiac Correctional Center:

> August 10, 1004 to December 9, 2004-Seventh Gallery of the North Cell House, #711.
> February 10, 2005 to March 12, 2005- Mental Health Unit, Living Unit #247.
> May 3, 2005 to November 23, 2005- Mental Health Unit, Living Unit # 432.
> January 9, 2006 to February 21, 2006- North Cell House, Living Unit #327
> February 21, 2006 to February 22, 2006- North Cell House, Living Unit #148.
> (Def. Memo, Ex. D, Melvin Aff, p. 1)

It is not entirely clear from the information before the court where the plaintiff was housed in the interim periods.

The defendants state that all mental health professionals who provided care to Mr. Stewart at Pontiac Correctional Center were qualified as a psychiatrist, physician, psychiatric nurse, clinically trained psychologist or have a masters degree in social work with appropriate clinical training. (Def. Memo, Garlick Aff., p. 8)

Dr. Garlick states that any other members of the crisis intervention team are required to receive 16 hours of specialized training before working on the team. (Def. Memo, Garlick Aff. P. 8).  In addition, they are required to receive an additional one hour of training each quarter.

### III. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56c.  Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000).  A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e).   In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

## IV. ANALYSIS

### A. DEFENDANTS WALKER, JESSE MONTGOMERY AND RICHARD MONTGOMERY

These defendants argue that the plaintiff has failed to demonstrate that they were personally responsible for the allegations in the plaintiff's complaint. "(A) defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established in order for liability to arise under 42 U.S.C. §1983." *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981). In addition, the doctrine of *respondeat superior* (supervisor liability) does not apply. *Pacelli v. DeVito*, 972 F.2d 871, 877 (7th Cir. 1992). "(A) supervising prison official cannot incur §1983 liability unless that officer is shown to be personally responsible for a deprivation of a constitutional right." *Vance v Peters,* 97 F.3d 987, 992 (7th Cir. 1996).

Defendant Walker is the Director of the Illinois Department of Corrections and is therefore responsible not just for Pontiac Correctional Center, but also for all inmates in all correctional facilities. The defendants have provided evidence that Walker did not review, receive or respond to individual inmate correspondence, nor did he personally review or sign any of the plaintiff's grievances. The plaintiff has presented no evidence to refute this claim.

Defendant Richard Montgomery states that he does not know the plaintiff, nor did he ever work in the area of the prison where the plaintiff was housed. This defendant provided this information to the plaintiff in his responses to interrogatories. *See* May 27, 2008 Court Order. The plaintiff has presented no evidence to refute this claim.

The plaintiff states he has no claims against Defendant Jesse Montgomery. (Def. Memo, Ex. F, p. 66, Plain Resp. p. 117). The plaintiff has failed to show any of these defendants had personal responsibility for the claims in his complaint.

### B. DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL CONDITION.

The medical defendants, Kowalkowski, Garlick, Larson, Angus, Smith, Zehar and Fletcher, argue that the plaintiff has failed to establish that they violated his constitutional rights. It is well settled that the Eighth Amendment protects the both the physical and mental health of prisoners. *Sanville v McCaughtery,* 266 F.3d 724, 734 (7th Cir. 2001). However, in order to show a constitutional violation, the plaintiff must pass both an objective and a subjective test. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). The plaintiff must first demonstrate that the alleged deprivation was sufficiently serious. *Id.* Second,

the plaintiff must show that the defendants acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). The defendants argue that the plaintiff cannot establish deliberate indifference.

The Eighth Amendment requires that the plaintiff "must demonstrate something approaching a total unconcern for his welfare in the face of serious risks." *Duane v. Lane,* 959 F.2d 673, 677 (7th Cir. 1992) In other words, "a finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42). Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987). In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997).

"[P]roof of deliberate indifference may be found where a prison official intentionally denies or delays access to medical care or intentionally interferes with the treatment once prescribed." *Jones v. Natesha* ,151 F.Supp.2d 938, 945 (N.D. Ill.  2001) *citing Ford,* 2001 WL 456427 at 6. However, "an inmate who complains that delay in medical treatment rose to constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

The plaintiff appears to have three main claims concerning this medical/mental-health care at Pontiac Correctional Center. First, he claims that he was injuring himself regularly and received no care. Second, the plaintiff alleges he did not receive enough group therapy. Finally, he claims that the defendants refused to follow Dr. Kowalkowski's order to transfer him to the Mental Health Unit.

The plaintiff has failed to demonstrate that he did not receive care for his injuries. The extensive medical record demonstrates that the plaintiff was seen by doctors, nurses, psychologists and psychiatrists on a regular basis and at times, on a daily basis. He was prescribed medication, provided counseling and monitored during his confinement.  Mental Health Evaluations were repeatedly performed.  When no other avenue worked, the plaintiff was placed in restraints to prevent him from harming himself. Then he was placed on close supervision with checks every 10 minutes. Those intervals were gradually extended, each time after the plaintiff was re-evaluated.  While the plaintiff does not agree with the treatment he received and believes he should have received more group therapy, this does not state a violation of his Eighth Amendment rights. *Forbes,* 112 F.3d at 267. The  record before the court clearly shows that the plaintiff was not denied treatment for his mental health concerns and the records clearly demonstrates the defendants were not deliberately indifference to the plaintiff's needs.

The plaintiff also alleges that the defendants failed to transfer him to the Mental Health Unit as soon as Dr. Kowalkowski made the recommendation in May of 2004. However, the plaintiff admits he is not familiar with the procedure for such a transfer and the defendants state

14

that all requirements were met. The doctor did not recommend an emergency transfer. Dr. Kowalkowski recommended a voluntary, non-emergency transfer because he believed the plaintiff might benefit from the group therapy available in the unit.

The plaintiff then contributed to any delay in placement when he refused to sign the transfer recommendation until July 21, 2004. The court notes that in response to the dispositive motion, the plaintiff now alleges that he did originally signed the transfer recommendation in May of 2004, and then for some reason signed it again in July of 2004. The court notes that the plaintiff has never made this claim before, not even in his deposition. (Def. Memo, Plain. Depo, p. 59). In addition, the medical record supplied by the plaintiff clearly shows in July of 2004, the plaintiff signed the recommendation and "backdated" it to May. (Plain. Resp., Ex. 11-C).

The plaintiff was then transferred to the Mental Health Unit four months after he signed the transfer recommendation. The Medical Record repeatedly states the plaintiff could not be moved until a bed became available. The plaintiff has presented no evidence to dispute this claim nor has he presented evidence that any defendant purposefully delayed or interfered with this transfer. The plaintiff has also presented no evidence that he was denied psychiatric care during this time period beyond his general accusations that are not supported by the medical records. In addition, it appears from the record before the court that the only care that was available to the plaintiff in the Mental Health Unit that was not available in the North Cell House was group therapy.

Beyond his three main claims, the plaintiff also makes a variety of other accusations. For instance, the plaintiff claims that Nurse Zehr refused to give him his psycho tropic medications on three occasions: November 19, 20 and 21, 2005. The plaintiff further claims that Defendant Zehr falsified medical records to report that the plaintiff refused his medication on those days. The plaintiff has no explanation for why Nurse Zehr also noted that the plaintiff refused his medication on 10 other mornings, why a different nurse documented that the plaintiff refused his medication on 8 afternoons, or why Defendant Zehr reported the lack of medication to the plaintiff's psychiatrist. The plaintiff also does not respond to references in the medical record noting the plaintiff's admission that he did not always taken his medication.

Even if the court assumes the plaintiff's version of events is true, the plaintiff only claims he was denied medication on three days by Defendant Zehr. He was not denied access to medical or mental health care on those days. The plaintiff has presented no medical evidence that he was adversely effected during these three days. *See Langston,* 100 F.3d at 1240.

In addition, the trier of fact could not find that Dr. Fletcher was deliberately indifferent for canceling the plaintiff's prescriptions for a short period of time. The record demonstrates that the doctor was told that the plaintiff had failed to take his mediation over several days. Dr. Fletcher stays there can be serious or permanent side effects with the medication and clearly a failure to take prescribed medication on regular basis can be detrimental. Dr. Fletcher states it was her medical opinion that the plaintiff had no mental health need for the medications during the time period he went without them. Nonetheless, she agreed to renew the prescriptions on November 28, 2005 after the plaintiff vociferously protested.

The plaintiff alleges that Dr. Larson failed to approve testing to see if the drug Halodol was having an adverse impact on his organs. The plaintiff has presented no objectively serious medical need for this testing. His only argument is he believed he should have the testing due to the number of years he had taken the medication. The plaintiff has presented no evidence of any harm he suffered based on the failure to provide testing. The plaintiff has no constitutional right to a specific type of treatment. *Forbes,* 112 F.3d at 267.

The plaintiff also claim that Dr. Larson observed officers tormenting him, but took no action. The plaintiff's rendition of this allegation is plagued with inconsistencies. The plaintiff says he was behind a solid steel and plexiglass door and officers were using a waist-high chuck hole to throw ice water on him. The plaintiff says he saw Dr. Larson from approximately four cells away, coming through the gateway. He claims he yelled to Dr. Larson, and the officers stopped. In his deposition, the plaintiff was asked extensively about this incident and he stated:

> A: I was standing at the door, so I could grab the guy's hand who was throwing ice water in my cell to try and break his arm. So I was standing in the door. When I saw Dr. Larson, I started hitting the glass, calling for him.
>
> Q: Did you ever successfully grab the officer's arm?
>
> A: No, I couldn't get him. (Def. Memo, Plain. Depo, p. 41)

Now, in response to the motion for summary judgement, the plaintiff claims one officer was throwing water on him, while the other officer was poking him with a stick. He still claims the officers stopped when he called out to Dr. Larson. The plaintiff alleges that the doctor came up to his cell and saw that he was wet, but refused to take any action or replace his mattress.

Even if the court assumes the plaintiff's version of events were true, he does not allege that the doctor took part in the attack and clearly the doctor could not have stopped the occurrence since the plaintiff says the officers stopped as soon as he called out his name. At most, the doctor refused to replace a wet mattress, which is not a violation of the plaintiff's Eighth Amendment rights.

The court notes that in his deposition, the plaintiff does make one troubling claim that he was not allowed to see a psychiatrist from October 31, 2005 to July 31, 2006. (Def. Memo, Plain. Depo, p. 33) However, a review of the medical records demonstrates the plaintiff was seen and treated by psychiatrists Dr. Kowalkowski, Dr. Fisher and Dr. Fletcher during this time period.

The plaintiff also complains that Defendants Dr. Fletcher, Angus and Dr. Garlick approved his transfer out of the Mental Health Unit in December of 2005, the plaintiff claims there is no evidence he took more than $760 from another inmate and he claims the Internal Affairs report was false. Nonetheless, it as the medical opinion of those involved in the decision that the plaintiff "did not suffer from impairments of sufficient severity ..... that required continued placement in a specialized mental health setting. (Def. Memo, Garlick Aff, p. 6) The

plaintiff has not pointed to any specific treatment he could not receive outside of the Mental Health Unit beyond group therapy.

The plaintiff has presented more than 1,100 pages in response to the defendants pending summary judgment motions. However, the plaintiff has failed to provide specific details or evidence to rebut the motion. The plaintiff instead responds with several conclusory allegations.

For instance, the plaintiff claims the defendants altered his deposition. The court notes that the plaintiff did not sign his deposition. The plaintiff was given two hours to review his deposition, and then stated that the defendants had manufactured his responses. [d/e 193] The plaintiff failed to identify one specific sentence that was inaccurate.

The plaintiff alleges that the medical records are inaccurate or falsified or manufactured. The plaintiff also repeatedly claims the defendants conspired to prevent him from receiving adequate care. However, "conclusory allegations unsupported by specific facts will not suffice to rebut evidence supporting a summary judgment motion." *Andreola v. Wisconsin,* 2006 WL 3724633 at 2(Dec. 15, 2006) *See also Stagman v. Ryan*, 176 f.3d 986, 995 (7th Cir 1999) (statements outside affiant's personal knowledge or statements based on speculation or conjecture will not defeat a summary judgment motion.); *See also National Soffit & Escutcheons, Inc. v. Superior Systems*, Inc., 98 F.3d 262, 266 (7th Cir. 1996) (unsupported allegations do not raise an issue of fact precluding summary judgement.); *See also Scaife v. Cook County,* 446 F.3d 735, 740 (7th Cir. 2006)("to survive summary judgement, [plaintiff] needed to do better than make such broad-brushed conclusory allegations.").

The extensive medical record and affidavits from a variety of medical personnel demonstrate that care was provided by psychiatrists, psychologists, doctors and psychiatric nurses on an on-going basis. The plaintiff's mental health was repeatedly evaluated, he was given counseling, some group therapy and medication.

The record also demonstrates the plaintiff was transferred to Pontiac Correctional Center after he was removed from the Illinois Department of Corrections primary psychiatric unit at Dixon Correctional Center. The plaintiff was released from this psychiatric unit with a medical record stating he was a"[p]layer- manipulator, drug abuser while in the DD program." (Med. Rec, p. 751, 752). The court further notes that the plaintiff's most intense episodes of self-injuring behavior occurred when he was not housed in the unit or the location that he requested at Pontiac Correctional Center.

The plaintiff has failed to demonstrate that there is a genuine issue of material fact concerning whether the defendants were deliberately indifferent to his serious medical condition.

C. DEFENDANTS MELVIN, MOTE AND ORR.

These defendants claim they were justified in relying on the medical plan and treatment recommended by qualified medical health professionals. Defendants Mote and Melvin served as Pontiac Correctional Center Wardens and Defendant Orr is a Deputy Director for the Illinois

Department of Corrections. Prison administrators usually have no medical expertise and therefore must rely on health care professionals to assess the needs of prisoners and initiate treatment. *McEachern v. Civiletti,* 502 F.Supp. 532, 534 (N.D.Ill.1980). The record before the court demonstrates that the plaintiff was receiving extensive care from a variety of Mental Health professionals.

D. DEFENDANTS YOUNG AND SELVIDGE

The defendants argue that the plaintiff has failed to exhaust his administrative remedies for some of his claims concerning conduct by Defendant Selvidge in February 2005, December 2005 or March 2007. The defendants also say the plaintiff failed to exhaust his administrative remedies for any conduct by Defendant Young in February 2005. The Prison Litigation Reform Act provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. §1997e(a).

The defendants have provided an affidavit to support their claims from the Chairperson of the Office of Inmate Issues, Brian Fairchild. Fairchild says he has searched the records of the Administrative Review Board and finds no appeals filed by the plaintiff for grievances concerning these individuals during the stated time periods. (Def. Memo, Ex. E, Fairchild Aff.) The plaintiff has not presented evidence of an grievance he appealed to the Administrative Review Board or any other evidence to refute this claim.

In addition, the plaintiff has not presented any evidence to support his claims against these individuals. On some occasions, the plaintiff alleges the defendants did not provide him help afer he injured himself in his cell. However, the records for these dates demonstrate that the plaintiff was in the Mental Health Unit on these occasions. The medical records also demonstrate no injury to the plaintiff at this time.

The plaintiff also alleges that Defendant Selvidge failed to respond to his self-injuring behavior in December of 2005, but admits the defendant took him to the Health Care Unit. (Def. Memo., Plain Depo, p. 71-72).

The plaintiff has failed to demonstrate that he either exhausted his administrative remedies for his claims against Defendants Young or Selvidge or has failed to present evidence that they were deliberately indifferent to his medical or mental health needs.

E. FAILURE TO TRAIN

The court finds the plaintiff has also failed to establish any official capacity claims against any named defendant. The plaintiff claimed some supervisors had failed to properly train or supervise officers responsible for monitoring the plaintiff. However, if none of the

individual defendants inflicted a constitutional injury, the supervisor cannot be held liable on a failure to train theory. *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986).

  **IT IS THEREFORE ORDERED that:**

>  **1) The defendants' motions for summary judgment are granted. [d/e 217, 235, 242, 259]. The Clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56. The case is terminated. The parties are to bear their own costs.**
>
>  **2) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)©. If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g)**
>
>  **3) The agency having custody of the plaintiff is directed to remit the docketing fee of $250.00 from the plaintiff's prison trust fund account if such funds are available. If the plaintiff does not have $250.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $250.00 is paid in its entirety. The filing fee collected shall not exceed the statutory filing fee of $250.00.**
>
>  **4) The plaintiff is responsible for ensuring the $250.00 filing fee is paid to the clerk of the court even though his case has been dismissed. Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full. The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such change.**
>
>  **5) The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

Entered this 26th day of August, 2008.

s\Harold A. Baker
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE
